IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL F. MILLER,               :     CIVIL ACTION
                                :     NO. 17-2627
          Plaintiff,            :
     v.                         :
                                :
JEFF SESSIONS, ET AL.[1]        :
                                :
          Defendants.           :

**M E M O R A N D U M**

EDUARDO C. ROBRENO, J.                    February 4, 2019

## I.    INTRODUCTION

This action is about one citizen's individual Second
Amendment right to keep and bear arms.  The citizen wishes to
purchase and possess a firearm.  The Government contends that
under 18 U.S.C. § 922(g)(1), the citizen is permanently banned
from possessing a firearm because of a 1998 misdemeanor
conviction under the Pennsylvania Vehicle Code.  The citizen
challenges the federal statute as unconstitutional as applied to
him.  The citizen wins.

---

[1] Miller named Jeff Sessions, Attorney General of the United
States, Thomas E. Brandon, Acting Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives, Andrew G. McCabe,
Director of the FBI, and the United States of America as
Defendants.  Pursuant to Federal Rule of Procedure 25(d), their
respective successors are automatically substituted.

## II. BACKGROUND

Plaintiff Daniel F. Miller is a citizen of the United States who wishes to "purchase, possess and utilize firearms" after being denied the ability to do so.[2] Compl. ¶ 33, ECF No. 1. Miller has been denied the ability to purchase, possess, and use firearms on the basis of a 1998 misdemeanor conviction of the first degree, punishable by imprisonment for up to five years under the Pennsylvania Vehicle Code. Although the conviction does not disqualify Miller from purchasing, possessing, or using firearms under Pennsylvania law,[3] it does disqualify him under federal law. See 18 U.S.C. § 922(g)(1). Under federal law, a person convicted of a crime punishable by more than one year of imprisonment is banned from possessing a firearm for life. Id.

The background of this case revolves around a 1998 misdemeanor conviction. Miller was pulled over for having

---

[2] Miller learned that he was permanently banned from purchasing, possessing, or using firearms after he was denied a Pennsylvania License to Carry Firearms. Compl. ¶ 27. Although the denial of the license triggered Miller's efforts to seek relief, the relief he seeks in this lawsuit is much broader given the sweep of § 922(g)(1), which bans him from purchasing, possessing, or using firearms and ammunition for life.

[3] See 18 Pa. Const Stat. § 6105. The Court also notes that Pennsylvania's Constitution provides for a right to bear arms. See Pa. Const. art. I, § 21 ("The right of the citizens to bear arms in defense of themselves and the State shall not be questioned.").

window-tint on his car that, according to the patrolman who stopped him, was too dark.  Id. ¶ 19.  He had previously received an exemption from the Pennsylvania Department of Transportation ("PennDOT") for tinted windows on a previously owned car.  Id. ¶ 20.  Miller did not apply for a new exemption for his new car.  Id. ¶ 21.  Instead, with the aid of a typewriter, white-out, and a scanner, Miller replaced his previously owned car's Vehicle Identification Number ("VIN") on the exemption certificate with the VIN of his new car.  Id.; see also Miller Dep. 45-49.  Miller presented this altered PennDOT certificate to the Magisterial District Justice at his hearing regarding the window-tint violation.  Based on the asserted authenticity of this certificate, he was found not guilty of the window-tint violation.

After the hearing, the patrolman who had originally stopped Miller requested a copy of the PennDOT certificate that Miller had proffered to the court.  When the patrolman attempted to verify its authenticity, PennDOT informed him that Miller had never obtained a window-tint exemption for his new car.  PennDOT informed the patrolman that Miller had only ever received a window-tint exemption for his previously owned car.  It then became apparent that the certificate evidencing the window-tint exemption proffered in court had been altered and was not authentic.  As a result, Miller was charged with and later

pleaded guilty to possessing and using documents issued by
PennDOT that he knew were altered in violation of 75 Pa. Cons.
Stat. § 7122(3).[4]  Miller was sentenced to a year of probation,
which he completed successfully, and has had a spotless record
ever since.  Compl. ¶¶ 23-24; see also id. Ex. A, B.

Miller filed this action, challenging the constitutionality
of 18 U.S.C. § 922(g)(1) as applied to him.  He seeks a
declaration that his 1998 conviction for knowingly using an
altered PennDOT document does not justify the permanent
deprivation of his Second Amendment right and a permanent
injunction against the Government's enforcement of § 922(g)(1)
as applied to him.  Miller and the Government each have filed
motions for summary judgment.  ECF Nos. 15, 16.  The Court heard
oral argument, and the case is now ready for disposition.

## III. LEGAL STANDARD

Summary judgment is awarded under Federal Rule of Civil
Procedure 56 when "there is no genuine dispute as to any

---

[4] The Court notes that Miller was also convicted of unsworn
falsification to authorities in violation of 18 Pa. Cons. Stat.
§ 4904(a)(2), a misdemeanor of the third degree punishable by
not more than one year of imprisonment.  Id.  But because the
federal statute bans the possession of firearms by citizens
convicted of crimes punishable by more than one year, the
conviction of unsworn falsification to authorities does not
trigger the effect of the federal statute, and the Court does
not discuss this particular conviction further.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Liberty Mut. Ins. Co. v. Sweeney, 689 F.3d 288, 292 (3d Cir. 2012). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the Court views all facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). Although the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party, who must "set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The summary judgment standard is "no different when there are cross-motions for summary judgment."  Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  When confronted with cross-motions for summary judgment "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  Schlegel v. Life Ins. Co. of N. Am., 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (alteration in original) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)).

## IV.  DISCUSSION

The issue in this case is whether § 922(g)(1), as applied to Miller, violates the Second Amendment of the Constitution.

### A. The Second Amendment

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Its importance in the constitutional architecture has been described by Justice Joseph

Story as "the palladium of the liberties of a republic."[5]  3 J.

Story, Commentaries §§ 1890-91 (1833).

And yet, despite its centrality, since 1791 when the Second

Amendment was ratified, there has been a sharp division of views

on just what those twenty-seven words of the amendment mean.

Over the years, some scholars have concluded that the Second

Amendment was intended to protect states' rights to form

militias.[6]  Other scholars, with equal certitude as to the

---

[5] Justice Story likely borrowed this phrase from St. George
Tucker, a law student of George Wythe, lawyer, law professor at
the College of William and Mary, Virginia General Court and
Court of Appeals judge, and U.S. District Court judge.  See St.
George Tucker, 1 Blackstone's Commentaries: With Notes of
Reference to the Constitution and Laws of the Federal Government
of the United States and of the Commonwealth of Virginia App.
300 (1803) (discussing the Second Amendment and observing that
it "may be considered as the true palladium of liberty" and
further observing that the right of self-defense "is the first
law of nature").

[6] The Supreme Court also appeared to endorse this view when it
visited the issue in 1939 in U.S. v. Miller, 307 U.S. 174
(1939). There, the Supreme Court considered whether a "shotgun
having a barrel of less than eighteen inches in length" had a
"reasonable relationship to the preservation or efficiency of a
well regulated militia."  Id. at 178.  The Supreme Court
concluded that such a shotgun did not relate to the preservation
of a militia and further concluded that "[w]ith obvious purpose
to assure the continuation and render possible the effectiveness
of such [militia] forces the declaration and guarantee of the
Second Amendment were made."  Id.  Accordingly, the Supreme
Court observed that the Second Amendment "must be interpreted
and applied with that end in view."  Id.  But as is familiar
history now, some sixty-nine years later, the Supreme Court
revisited the Second Amendment in Dist. of Columbia v. Heller,
554 U.S. 570 (2008), bringing about a sea-change in Second
Amendment jurisprudence and scholarship.

meaning of the amendment, have contended that it protects an individual right to bear arms.  <u>See</u> <u>generally</u> Adam Winkler, <u>Gunfight: The Battle over the Right to Bear Arms in America</u> (2011).

In 2008, sixty-nine years after it last revisited the Second Amendment,[7] the Supreme Court ultimately held that in addition to "preserving the militia," the Second Amendment guarantees an individual right to keep and bear arms.  <u>Dist. of Columbia v. Heller</u>, 554 U.S. 570, 599, 634-35 (2008).  The "core" of the Second Amendment protects the right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  <u>Id.</u> at 634-35.  The Supreme Court has clarified that the Fourteenth Amendment incorporates the Second Amendment right recognized in <u>Heller</u>, making the right applicable to the states. <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 778, 791 (2010) (finding that the Second Amendment is "fundamental" to "our system of ordered liberty").

As are most rights, the Second Amendment right is not without bounds.  <u>See</u> <u>Heller</u>, 554 U.S. at 626.  In <u>Heller</u>, the Supreme Court identified a non-exhaustive list of "presumptively lawful" limitations such as "longstanding prohibitions on the

_____

[7] <u>See</u> <u>U.S. v. Miller</u>, 307 U.S. 174 (1939).  There is a certain narrative symmetry that eighty years ago the Second Amendment rights of a Mr. Miller were determined and that another Mr. Miller brings a different Second Amendment challenge today.

possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27.

## B. Third Circuit Second Amendment Jurisprudence

Post-Heller, the Third Circuit has considered the contours of the Second Amendment and "how a criminal law offender may rebut the presumption that he lacks Second Amendment rights." Binderup v. Att'y Gen. United States, 836 F.3d 336, 339 (3d Cir. 2016) (en banc). In a fractured en banc opinion, the Binderup court became the only appellate court to date to hold § 922(g)(1) unconstitutional in any of its applications.[8] See Medina v. Whitaker, --F. 3d--, 2019 WL 254691, at *2 (D.C. Cir. Jan. 18, 2019) (discussing Binderup). In Binderup, Judge Ambro authored the plurality opinion joined by six other judges in

---

[8] "No circuit has held the law unconstitutional as applied to a convicted felon." Medina, 2019 WL 254691, at *2; see also Hamilton v. Pallozzi, 848 F.3d 614, 626 (4th Cir. 2017); United States v. Vongxay, 594 F.3d 1111, 1114 (9th Cir. 2010) (en banc). But certain appellate courts have left open the possibility of a successful as-applied challenge by a misdemeanant, though the Third Circuit remains the only circuit to have so held. See Medina, 2019 WL 254691, at *5 (discussing that a misdemeanor "leading to the firearm prohibition . . . may be open to debate"). For a general discussion of how the different circuits have addressed this issue, see Carly Lagrotteria, Note, Heller's Collateral Damage: As-Applied Challenges to the Felon-in-Possession Prohibition, 86 Fordham L. Rev. 1963, 1989-91 (2018).

part and two other judges in part. Judge Hardiman authored a
concurrence joined by four other judges, and Judge Fuentes
authored a dissent joined by six other judges.

When no opinion garners a clear majority, the Third Circuit
has "looked to the votes of dissenting [judges] if they,
combined with the votes from plurality or concurring opinions,
establish a majority view on the relevant issue." United States
v. Donovan, 661 F.3d 174, 182 (3d Cir. 2011). "And when no
single rationale explaining the result enjoys the support of a
majority of the Court, its holding 'may be viewed as that
position taken by those Members who concurred in the judgments
on the narrowest grounds.'" Binderup, 836 F.3d at 356 (quoting
Marks v. United States, 430 U.S. 188, 193 (1977)). Judge
Ambro's opinion represents the narrowest holding and, therefore,
is the opinion that this Court follows today.

1. **The Binderup Opinion: Plurality, Concurrence, and
   Dissent**

The Binderup court considered two as-applied challenges,
each brought by a misdemeanant, to § 922(g)(1). One of the
challengers, Daniel Binderup, was convicted in a Pennsylvania
state court of corrupting a minor, a misdemeanor subject to
imprisonment for up to five years. Binderup, 836 F.3d at 340.
The other challenger, Julio Suarez, was convicted in a Maryland
state court of unlawfully carrying a handgun without a license,

10

punishable by imprisonment for not less than thirty days and not more than three years. Id. Eight years after that conviction, Mr. Suarez was also convicted of a state misdemeanor for driving under the influence, though the DUI conviction did not trigger § 922(g)(1). Id.

Although both challenges ultimately succeeded, the en banc panel split on the reasoning. Writing for the plurality, Judge Ambro reasoned that the challenges succeeded because the "offenses were not serious enough to strip [the challengers] of their Second Amendment rights," and the Government could not survive intermediate scrutiny in applying § 922(g)(1) to the challengers. Id. at 351, 353 (Ambro, J., plurality opinion). In reaching this conclusion, Judge Ambro analyzed the challenges under a two-step framework, under which the challenger must distinguish himself from the historically barred class of individuals by demonstrating that he was not convicted of a "serious crime" before shifting the burden to the Government in the second step to demonstrate that the ban survives intermediate scrutiny. Id. at 356. In order to assess the seriousness of a challenger's offense, Judge Ambro applied four factors: (1) whether the state legislature classifies the offense as a felony or a misdemeanor; (2) whether the offense was violent; (3) the actual punishment imposed; and (4) any

cross-jurisdictional consensus regarding the offense's seriousness.  Id. 350-52.

Judge Hardiman, in his concurrence, disagreed with the seriousness test, instead favoring an approach that emphasized dangerousness or violence.  Id. at 357-58 (Hardiman, J., concurring in the judgment).  Additionally, Judge Hardiman rejected the application of "heightened scrutiny" to such challenges, finding instead that the application of § 922(g)(1) in Binderup would be per se unconstitutional.  Id. at 358.

Writing for the dissent, Judge Fuentes agreed that the seriousness of the offense was the proper focus and that intermediate scrutiny was the appropriate standard.  Id. at 381, 399-401 (Fuentes, J., dissenting from the judgment).  He concluded that § 922(g)(1) "reasonably circumscribes" what constitutes a "serious crime" (i.e., a crime punishable by imprisonment for more than one year).  Id. at 381.  Under this reasoning, Judge Fuentes would have rejected the as-applied challenges because the offenses were sufficiently serious to warrant permanent disarmament.  Id.  Judge Fuentes went on to explain that given the challengers past criminal conduct, § 922(g)(1) survives intermediate scrutiny because the Government "adequately establishe[d] a connection between past criminal conduct and future gun violence."  Id. at 401.

Here, Miller does not argue that § 922(g)(1) is unconstitutional on its face. Rather, Miller argues that § 922(g)(1) is unconstitutional as applied to him and deprives him of his "core" right under the Second Amendment—defense of himself and his family within the home. Pl.'s Mot. Summ. J. at 4. As Judge Ambro's plurality opinion governs as-applied Second Amendment challenges in the Third Circuit,[9] the Court next turns to Judge Ambro's framework in <u>Binderup</u> to assess Miller's as-applied challenge.

## 2. As-Applied Second Amendment Challenges

An as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." <u>United States v. Mitchell</u>, 652 F.3d 387, 405 (3d Cir. 2011) (quoting <u>United States v. Marcavage</u>, 609 F.3d 264, 273 (3d Cir. 2010)).

Under § 922(g)(1), a person convicted of "a crime punishable by imprisonment for a term exceeding one year" is banned from possessing firearms for life.[10] 18 U.S.C. § 922(g)(1).

---

[9] <u>See</u> <u>supra</u> 10.

[10] A state crime classified as a misdemeanor that is "punishable by a term of imprisonment of two years or less" is excluded from this ban. 18 U.S.C. § 921(a)(20)(B). Additionally, the ban exempts from its reach "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." <u>Id.</u>

Because Miller's conviction was punishable by up to five years in prison, he is subject to this "presumptively lawful" firearm ban. Accordingly, this Court must consider whether Miller's particular circumstances remove him from the "constitutional sweep of § 922(g)(1)." Binderup, 836 F.3d at 346 (Ambro, J., plurality opinion).

Under Judge Ambro's two-pronged framework, the Binderup-Marzzarella framework, for assessing as-applied Second Amendment challenges, see generally id. at 356-57, the Court considers "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. at 346 (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)). Second, if the challenged law burdens conduct within the scope of the Second Amendment, then the Government must demonstrate that it nevertheless survives some form of heightened scrutiny. See id. The Court now turns to the application of this framework to the facts of Miller's case.

### C. Applying the Binderup-Marzzarella Framework

#### 1. Step One: § 922(g)(1) Burdens Miller's Second Amendment Right

Step One of the Third Circuit's framework requires Miller to "(1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his

background that distinguish his circumstances from those of persons in the historically barred class," (i.e., individuals convicted of "serious crimes"). Id. at 347.

### a. Traditional Justifications for Denying Individuals Convicted of "Serious Crimes" Second Amendment Rights

In assessing whether Miller has satisfied his burden under step one, the Court first considers the traditional justifications for denying individuals convicted of "serious crimes" Second Amendment rights. Typically, the traditional justifications tend to focus on "the concept of a virtuous citizenry" and the right of the Government to disarm "unvirtuous citizens." See id. at 348 (citing United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010)); see also Saul Cornell, "Don't Know Much about History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 679 (2002). Specifically, those individuals who have committed or are likely to commit violent crimes would "undoubtedly qualify as 'unvirtuous citizens' who lack Second Amendment rights." Binderup, 836 F.3d at 348.

Heller, however, broadens the category of unvirtuous citizens to individuals who have committed not only violent criminal offenses but also "serious" criminal offenses, whether violent or nonviolent. Id. Accordingly, in distinguishing

himself from the historically barred class, Miller must
demonstrate that he was not convicted of a "serious crime."  Id.
at 349.

> **b. Applying Binderup's Four Factors to Determine**
> **Whether Miller's Offense is a "Serious Crime"**

In Binderup, Judge Ambro identified four factors to
consider when determining if a challenger has been convicted of
a serious crime.  Specifically, the Court looks to (1) whether
the state legislature classifies the offense as a felony or a
misdemeanor; (2) whether the offense was violent; (3) the actual
punishment imposed; and (4) any cross-jurisdictional consensus
regarding the offense's seriousness.  Id. at 351-52.  Although
the Third Circuit has not yet instructed the district courts as
to how much weight to afford each factor, at least one district
court has found that "[n]o one factor is dispositive."  Holloway
v. Sessions, --F. Supp. 3d--, 2018 WL 4699974, at *4 (M.D. Pa.
Sept. 28, 2018), appeal docketed, No. 18-3595 (3d Cir. Nov. 30,
2018) (applying the Binderup factors).  The Court agrees that
the Binderup factors call for a balancing test, given that no
factor is dispositive.

As to the first factor, Pennsylvania has classified
Miller's crime as a misdemeanor.  It is punishable by
imprisonment for up to five years, and although the "maximum
possible punishment is 'certainly probative' of the offense's

seriousness," the classification by the state legislature as a misdemeanor is an important consideration.  Id. (quoting Binderup, 836 F.3d at 351-52).  Indeed, such a classification is "a powerful expression of [the state legislature's] belief that the offense is not serious enough to be disqualifying." Binderup, 836 F.3d at 351.  Although labeling an offense as a misdemeanor is not conclusive, it is important in the Second Amendment context because it reflects the legislature's assessment of the seriousness of the offense.  As the D.C. Circuit has observed, "[w]hen the legislature designates a crime as a felony, it signals to the world the highest degree of societal condemnation for the act, a condemnation that a misdemeanor does not convey."  Medina, 2019 WL 254691, at *6. Here, given that the legislature has classified this type of offense as a misdemeanor, this factor weighs in Miller's favor.

As to the second factor, the Court must consider whether the offense had a violent element.  In the instant case, the crime was wholly non-violent.  Although "it is possible for non-violent crimes to be serious, the lack of a violence element is a relevant consideration."  Id.  Again, here, this factor weighs in Miller's favor.

As to the third factor, the Court considers the actual punishment imposed.  As the label of a misdemeanor reflects the legislature's assessment of the offense, the actual punishment

17

imposed reflects a judicial assessment of the gravity of the offense. Here, Miller was sentenced to a year of probation, which he completed successfully. Just as it was important in Binderup that the challengers each received minor sentences, it is important in Miller's case, too. As the Third Circuit noted, "severe punishments are typically reserved for serious crimes."[11] Id. Accordingly, this factor also weighs in Miller's favor.

As to the fourth factor, the Court considers whether there is cross-jurisdictional consensus regarding the seriousness of the offense. In Binderup, the challengers could not show that

---

[11] The Government cautions the Court against placing too much weight on the sentence Miller received because there are no records of his sentencing. Defs.' Mot. Summ. J. at 13. But in support of this argument, the Government relies on Gurten v. Sessions, a recent case from this district, that is readily distinguishable. 295 F. Supp. 3d 511 (E.D. Pa. 2018). There, the challenger, who was convicted of a felony and engaged in violent conduct, entered into a guilty plea to three of the charges against him after the victim declined to testify. See Gurten, 295 F. Supp. at 524-28. In that case, although the challenger was only sentenced to probation, community service, and court costs, the court declined to place much weight on the lenient sentence, concluding that the sentencing judge likely did not consider the challenger's full conduct because the victim declined to testify. See id. at 527-28.

In the instant case, however, although no sentencing records exist, there is no reason to think that the sentencing judge did not consider Miller's full conduct. The Third Circuit has observed that "the punishments are selected by judges who have firsthand knowledge of the facts and circumstances of the case." Binderup, 836 F.3d at 352. The Third Circuit has not indicated that a district court should accord this factor less weight in the mere absence of sentencing records.

numerous states considered their crimes to be non-serious, but they did show a lack of consensus across jurisdictions. Binderup, 836 F.3d at 353. Here, Miller has also not shown a cross-jurisdictional consensus that many states consider his crime to be non-serious. On the other hand, the Government's fifty-state survey suggests that many states punish similar crimes by more than one year of imprisonment and label similar crimes as a felony. See Fifty State Survey, ECF No. 15-5. Miller, however, disputes the similarity of a number of the other states' crimes, pointing out, for example, that his offense only required possession and use of an altered PennDOT document while many of the offenses in the Government's survey require the offender to alter or forge a document. Whatever the relative merits of the parties' arguments, the Court need not compare the similarities and differences between Miller's crime and the crimes in the Government's survey because even if this factor is given some weight in the Government's favor, it does not outweigh the other three factors that weigh in Miller's favor.

After balancing the Binderup factors and viewing the agreed-upon facts in the light most favorable to the Government, the Court concludes that the crime of which Miller was convicted

in 1998, which disqualifies him from purchasing, possessing, or using a firearm, is not a "serious crime" under <u>Binderup</u>.[12]

## 2. <u>Intermediate Scrutiny</u>

Having found that Miller has met his burden to distinguish himself from individuals convicted of "serious crimes," the Court next considers the second prong:[13] whether § 922(g)(1), as applied to Miller, survives at least some form of heightened

---

[12] In addition to being distinguishable from <u>Gurten</u>, the Court notes that this case is distinguishable from other district court cases in the Third Circuit addressing as-applied challenges to § 922(g)(1) because the other cases do <u>not</u> involve non-violent state misdemeanors committed by individuals without a history of violence. <u>See, e.g.</u>, <u>Tripodi v. Sessions</u>, 339 F. Supp. 3d 458, 465 (E.D. Pa. 2018) (holding that the challenger could not satisfy his burden at step one and emphasizing that the challenger was convicted of a crime that the legislature had labeled as a felony); <u>United States v. Irving</u>, 316 F. Supp. 3d 879, 888 (E.D. Pa. 2018) (same); <u>United States v. Brooks</u>, 341 F. Supp. 3d 566, 597, 606 (W.D. Pa. 2018) (holding that although the challenger satisfied step one and demonstrated that the offense was not "serious," the federal statute survived intermediate scrutiny because the challenger had a history of engaging in gun violence).

[13] Miller argues that the second prong of the <u>Binderup-Marzzarella</u> framework requires impermissible interest-balancing in light of the Supreme Court's decisions in <u>Heller</u> and <u>McDonald</u>. Pl.'s Mot. Summ. J. at 19. The Court disagrees. The Supreme Court has not foreclosed the use of traditional levels of scrutiny for "evaluating Second Amendment restrictions" but rather has rejected a "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" <u>Heller</u>, 554 U.S. at 634-35. In other words, some form of constitutional scrutiny must still be applied, though no level of scrutiny was actually established in <u>Heller</u>. <u>Id.</u> at 628-29, 634-35.

scrutiny.  The Third Circuit in <u>Binderup</u> determined that the appropriate level of heightened scrutiny is intermediate scrutiny.[14]

Under intermediate scrutiny, it is the Government's burden to demonstrate the "appropriateness of the means it employs to further its interest."  <u>Binderup</u>, 836 F.3d at 353.  In other words, is there a substantial fit between the means and the ends?  Here, the "presumptively lawful" ban under § 922(g)(1) will survive intermediate scrutiny if the Government shows a substantial fit between disarming Miller and its important interest in "protecting the community from crime."  <u>See id.</u> at

---

[14] The Court recognizes that whether <u>Heller</u>'s heightened scrutiny should be read to mean strict scrutiny as opposed to intermediate scrutiny continues to be debated.  <u>See, e.g.</u>, <u>Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.</u>, 910 F.3d 106, 129-30 (3d Cir. 2018) (Bibas, J., dissenting) (discussing that "[i]n picking a tier of scrutiny, our job is to ask only whether the ban extends to the home and impairs the gun's self-defense function" and concluding, in dissent, that strict scrutiny should have been applied).  As Judge Bibas noted in dissent, "the only question is whether a law impairs the core of a constitutional right, whatever the right may be."  <u>Id.</u> at 129.

Although strict scrutiny would indeed appear to be the logical standard of scrutiny to the extent that § 922(g)(1) burdens Miller's core Second Amendment right to keep and bear arms to defend his home, the Third Circuit has held otherwise.  <u>See</u> <u>Binderup</u>, 836 F.3d at 353-54 (following the lead of prior Third Circuit precedent and applying intermediate scrutiny).  Given the Third Circuit's application of intermediate scrutiny in <u>Binderup</u> and again in <u>N.J. Rifle</u>, the Court applies intermediate scrutiny.  Additionally, the level of scrutiny does not change the outcome in this case as a practical matter because the Government cannot meet its burden under either strict or intermediate scrutiny.

353-56; see also Holloway, 2018 WL 4699974, at *7.  To meets its burden, the Government "must 'present some meaningful evidence . . . to justify its predictive . . . judgment[].'"  Id. at 354.  The Government cannot meet its burden in this case.

To satisfy its burden, the Government is allowed to rely on the record or "common sense" in presenting evidence to justify disarming Miller.  Id. at 354.  Indeed, the Third Circuit has recently explicitly stated that empirical evidence is not necessary.  Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 120 n.24 (3d Cir. 2018).  But, here, the evidence in the record and common sense do not support the Government's assertion that Miller is "potentially irresponsible" and so could harm the public.  Although it is true that over twenty years ago Miller altered a PennDOT document and presented it to a patrolman and a judge, Miller has since had a spotless record.  Moreover, there is nothing in the record that shows that Miller's disrespect for the law in 1998 is the kind of disrespect that would make allowing him to possess a firearm dangerous to his community.

Under the circumstances, even when viewed in the light most favorable to the Government, § 922(g)(1), as applied to Miller, does not survive intermediate scrutiny because the Government has failed to demonstrate a substantial fit between disarming Miller and protecting the community from crime.

## D. **Permanent Injunctive Relief**

Deciding that § 922(g)(1) is unconstitutional as applied to Miller is not the end of the road. The Court must next decide if permanent injunctive relief is appropriate. The decision to grant a permanent injunction is within the discretion of the district court. See Free Speech Coalition, Inc. v. Att'y Gen. United States, 825 F.3d 149, 173 n.21 (3d Cir. 2016) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). To grant a permanent injunction, the Court considers whether "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).

Here, Miller has shown actual success on the merits because he has met his burden of distinguishing himself from the class of individuals who commit "serious crimes." See CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co., 747 F.2d 844, 850 (3d Cir. 1984) ("In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof).").

Next, Miller will suffer an irreparable injury if the permanent injunction is denied because, as some courts have held

under certain circumstances, the deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury." Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v. Burns, 427 U.S. 347, 373-74 (1976) (plurality opinion)); see also 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (3d ed. 2013).

Finally, taking the third and fourth factors together, the permanent injunction will not result in greater harm to the Government and will benefit the public interest. Indeed, the Government cannot point to any hardship from an award of permanent injunctive relief nor would the public interest be disserved "by permanently enjoining defendants from continued infringement of a citizen's constitutional rights." Holloway, 2018 WL 4699974, at *9. To the contrary, as forever memorialized by the "inscription on the walls of the Department of Justice," the Government "wins its point whenever justice is done. . . ." Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Berger v. U.S., 295 U.S. 78, 88 (1935) (explaining that the Government's interest "is not that it shall win a case, but that justice shall be done."). Indeed, in this case, a permanent injunction restoring a citizen's constitutional rights promotes the public interest in justice being done.

Under the circumstances, the Court will grant Miller's request for permanent injunctive relief.

## V.  CONCLUSION

Here is the upshot: § 922(g)(1) is unconstitutional as applied to Miller.  The Court reaches this conclusion after considering the two prongs under the Binderup-Marzzarella framework.  First, after balancing Binderup's four factors, the Court concludes that Miller was not convicted of a "serious crime."  Second, § 922(g)(1) as applied to Miller does not survive intermediate scrutiny because the Government has failed to show a substantial fit between disarming Miller and serving its important interest in protecting the community from crime.

For the foregoing reasons, the Court will grant Miller's Motion for Summary Judgment and will deny the Government's Motion for Summary Judgment.  The Court will also grant Miller's request for a declaratory judgment that the 1998 misdemeanor conviction for a violation of the Pennsylvania Vehicle Code does not prohibit him from possessing, purchasing, or using firearms and ammunition.  The Court will also grant Miller's request for permanent injunctive relief barring the federal government from enforcing § 922(g)(1) against him.

An appropriate order follows.